# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. TERESA PRUITT
### IN RE: A.J.P.

**Appeal from the Juvenile Court for Montgomery County**
**No. 59-149    Hon. Wayne C. Shelton, Judge**

---

**No. M2000-00416-COA-R3-CV - Decided June 27, 2000**

---

The State of Tennessee, Department of Children's Services, petitioned the Juvenile Court for Montgomery County in the matter of A.J.P., a seven-year-old child, asking the Court to terminate the parental rights of the child's mother, Teresa Kay Pruitt. At trial, the evidence revealed that Mother had been diagnosed as schizophrenic and that she had repeatedly refused to take medication, resulting in long periods of inability to take care of herself or her children. She moved frequently from place to place and sometimes lived on the street. She testified that she had voluntarily terminated her rights to two older children because she had determined it to be in their best interest. She also testified that she thought her doctors were wrong about her diagnosis and that the medication made her sick. This Child has been a ward of the State for more than half of his life. Counsel for the State argued that Mother had been involved with the Department for seven years with consistently poor results and that the Child was closely approaching the age when he might not be adoptable. The Juvenile Court terminated Mother's parental rights. She appeals, raising the issues of (1) whether the preponderance of the evidence supports termination of her parental rights, and (2) whether the Juvenile Court erred in failing to appoint counsel for Mother until two months prior to the hearing. We affirm the judgment of the Juvenile Court.

**T.R.A.P. Rule 3; Judgment of the Juvenile Court Affirmed; case Remanded.**

SWINEY, J., delivered the opinion of the court, in which FRANKS, J., and SUSANO, J., joined.

Sheri S. Phillips, Clarksville, for the Appellant, Theresa Pruitt.

Paul G. Summers, Attorney General, and Douglas Earl Dimond, Assistant Attorney General, General Civil Division, Nashville, for the Appellee, State of Tennessee.

# OPINION

## Background

We will discuss the facts of this case in some detail as they are crucial to our decision. A. J. P. ("Child") was born July 18, 1992, to Theresa Kay Pruitt ("Mother"). The Child first came into the custody of the Department of Children's Services (DCS) when he was eleven months old. He remained in foster care for nearly two years, until March 1995, when he was returned to Mother. He was again placed in foster care by DCS seven months later, where he remained for the next six months. He was in Mother's custody for two years, but DCS removed him from Mother for the third time in March 1998. At the time of trial, the Child remained in DCS custody. As of the date of trial, the child had spent 3-1/2 years with Mother and four years in foster care, with the most recent year and a half being in foster care.

Ms. Valerie Geary, former employee of DCS, testified that she was the case manager for the Child until October 1998, when she left her job with the State for other employment. She drafted a care plan for the Child and explained to Mother in detail what would be expected of her in order for the Child to be returned to the home. She stressed to Mother that she must complete the care plan, especially because this was the Child's third time in foster care. She reviewed the Child's longstanding foster care record and discussed Mother's status with Mother's case worker. Mother's medical records showed a diagnosis of schizophrenia by history. She opined that the root of the Child's problem which led to his removal from the Mother's custody was that Mother would not take her medications as prescribed for schizophrenia.

Ms. Geary testified that when the Child came into foster care for the third time, the plan she and Mother agreed to was for Mother to go back to a local mental health center, see a therapist there on a regular basis, and take her medications as prescribed there. Mother told her repeatedly that she did not need the medication. Mother was a transient, living numerous places for short periods of time and moving in with various friends. Ms. Geary was unable to keep track of her whereabouts. Mother did not keep scheduled appointments, whether with the case worker, at the mental health center, for housing assistance, or for visitation with the Child. Ms. Geary learned that Mother's mental health counselor had been appointed to handle her disability income, and that Mother had asked him for money for food, but failed to mention that she did not have housing. Ms. Geary had to call the mental health worker and tell him that Mother had no home. The mental health worker then found a trailer, paid the deposit and rented it for Mother, but Mother only stayed there for two months, and left there complaining that she did not like the neighborhood or the trailer. Mother was asked numerous times to provide a new address, but she always said she did not know the address. It became very difficult to find her to set up visitation or to help her in any other way. Ms. Geary testified that Mother was lucid and competent when she took her medication, but when she did not take it,

> I don't even think she fully comprehended who I was
> at that point. And I tried talking with her, tried

explaining to her, you know, the need for her to take her medication. I even asked her has she taken it that day, and she told me no, she had not. At that point, she wandered out of the office into the parking lot and I stood at the window and I watched her. She wandered around the parking lot several times before finally just driving off.

Ms. Geary testified that the Child acted like a normal child until Mother began missing scheduled visitation appointments. When he was taken for visitation and Mother did not show up, the Child would throw tantrums, kick the foster parents' furniture and stomp around. After a number of these incidents, Ms. Geary had to change the procedure and not pick up the Child for visitation until Mother actually showed up. The Child's behavior became worse at school and in foster care after Mother missed visitation:

he was realizing that this time was not like the two – two times before, You know, that he may not be going home any time soon or if ever . . . and that was his question every day, you know, "When am I going home to my mom? When can I go home to Mom? Where is my mother at?"

Because of the Child's increasing behavior problems, Ms. Geary transferred him from regular foster care to therapeutic foster care through OmniVisions, an organization which specializes in placing foster children in homes where the foster parents have specialized training to handle children with serious behavior problems.

Perhaps most significantly for our purposes, Ms. Geary testified that when she left her job at DCS, Mother had made no progress towards being able to have the Child returned to her care. Mother had told Ms. Geary that she would not work with anyone who had any affiliation with the Harriet Cohn mental health center, and she "was steadfastly refusing to see a therapist." Ms. Geary sat with Mother in her office, calling various therapists, with Mother refusing to see them and screaming at Ms. Geary. Ms. Geary finally gave Mother a list of potential therapists and told her that it was her responsibility to contact any one of them that she was willing to see. Ms. Geary, Mother and the Juvenile Judge met in the Judge's chambers on June 21, 1998, and the Judge explained to Mother that this was her third try at becoming stable enough to have custody of the Child. Mother promised to try to work with DCS.

On cross-examination, Ms. Geary testified that when she observed Mother and Child together, their relationship was good. She opined that the Child loved his Mother. She was not aware of any child abuse by Mother, but that Mother's illness caused her to neglect the Child. She further opined that if Mother were to be compliant and stay on her medication consistently, she

-3-

would be able to care for the Child. Mother complained to Ms. Geary that her medication made her sick, and so Ms. Geary talked to Dr. Camoens, a treating physician, who changed Mother's medication. Mother only showed up for the initial doctor's appointment and missed the follow-up appointments.

Ms. Sharon Bouldin testified that she took over Ms. Geary's clients, including this Child, in November 1998. She first met Mother in December 1998, and opined that Mother was "stabilized" at that time. Because Mother seemed to understand and to want to cooperate, Ms. Bouldin scheduled visitation for her with her Child for every Tuesday from 4 pm until 5 pm. However, Ms. Bouldin didn't see Mother again until February 23, 1999, because Mother "just didn't show up." Mother then appeared again on May 13, 1999, and explained that she had been hospitalized in Nashville, because she had an argument with her father "and her father had called the police on her and they had to send her to the mental hospital in Nashville. And she did state that she was homeless at that time." Owing to missed appointments, Mother only saw her Child twice from December 1998 to May 13, 1999. Despite the no-shows, Ms. Bouldin continued to contact OmniVision and have the Child brought to DCS for the scheduled visits. Ms. Bouldin testified:

> Ms. Pruitt did not show up and it was traumatic with Antonio. He would look out the window - I even had in my dictation, he would stare out the window looking for Ms. Pruitt to show up. And then I would get problem reports from Ms. Alisha Shipman saying how his behavior has just increased consistently.

Mother did not have a phone, so Ms. Bouldin could not contact her. Mother would sometimes "just show up" and ask to see the Child, which was not possible with no prior arrangement because coordination with OmniVision was required. With all of these difficulties, visitation actually took place on June 20, 1999; August 10, 1999; August 27, 1999 and September 16, 1999. Trial was held on September 27, 1999. For the calendar year preceding trial, it appears that Mother had managed to keep scheduled appointments for visitation, which could have been weekly, no more than seven or eight times. At the time of trial, Ms. Bouldin had abandoned the pre-set appointments and had adopted the practice of just waiting for Mother to contact her and ask for visitation, and then contacting OmniVision to get the Child brought in for the visit.

Ms. Bouldin testified on cross-examination that Mother consistently promised "to work the program and get Antonio placed home with her." She opined that Antonio loves his mother, and when Mother is with Antonio, she loves him. During the two months immediately prior to trial, after Mother was appointed counsel, Mother called Ms. Bouldin on many occasions and reached an answering machine and asked for visitation. Ms. Bouldin did not always respond to the calls. When Mother is taking her medication, she is coherent and able to care for Antonio. Ms. Bouldin agreed that, at the time of trial, she had confirmed that Mother was seeing her therapist, was attending group therapy and was taking her medication. She also testified that, as of the date of trial, Mother was living in an apartment with a friend, but had told Ms. Bouldin that "she feels that her roommate was on drugs and her roommate was moving."

-4-

Ms. Alicia Shipman, case manager with OmniVision Therapeutic Foster Care Agency, testified that her agency provides a foster home for the Child and she is his case manager. The Child has been with OmniVision since September 10, 1998, and was transferred from regular foster care to therapeutic foster care because of his behavior. The agency provides psychological, psychiatric and mentoring services for the Child, who is under the care of Dr. Joyce Mar, a psychologist at the family counseling center in Clarksville and Dr. Elizabeth Pritchard, a psychiatrist. Ms. Shipman opined that the Child's behavior problems are attributable:

> . . . to him seeing his mom, visitation, and also – and this is after visitation – he would have behavior outbursts, and also with the peer relations . . . school problems . . . . usually the first four or five days after visitation, he is pretty much defiant with the foster parents, but after four or five days he comes – becomes himself again."

Ms. Shipman testified that she tries to tell Mother about problems her Child may be having with behavior in school or in foster care, and Mother usually tries to talk with her Child about the right and wrong way to act in these settings. Visitation was supposed to be scheduled for four hours per month (i.e., one hour per week), but some of that visitation was missed because of no-shows by Mother or because the Child had conflicting appointments with Dr. Mar. When the Child came for visitation and his mother did not show up,

> he would cry a little bit, he would wonder why his mother didn't show up. He [has] even asked for me to drive to her residence, which I stated that I did not know where his mother lived. And to try to cover the sadness, we would usually go out for an activity, such as ice cream.

Ms. Shipman testified that the Child is now in his third foster care placement with OmniVision. Two removals from foster homes were due to his behavior in those foster homes and the foster families not really being able to continue care for him. She opined the reason for his behavior, which she characterized as "very, very defiant," was that he wanted to see his mother.

Counsel for the parties stipulated the testimony of two mental health workers involved in Mother's treatment, to the effect that Mother had been compliant in keeping her appointments and taking her medication for eight weeks immediately prior to trial.

Mother then testified that she has a one-bedroom apartment and is working at a car wash. She has been diagnosed as a schizophrenic "since my divorce," but

> I feel that I might have been misdiagnosed. I feel like

I'm more of a post-traumatic stress disorder with depression. I was beat by my husband and held at gunpoint. I - - I go into shock very easy. I can't take a lot of stress.

She testified that she has asked the case workers at the mental health center for "a complete medical evaluation" but has not had one. She believes that her father and her ex-husband have made false statements about her which led to her being diagnosed as schizophrenic. The medication she is taking makes her sick, but she is now taking it anyway, in order to have custody of her son. She has also been going to therapy every week and has seen her psychiatrist "for about 15 minutes twice a month." She feels her time with the psychiatrist is inadequate. She is willing to continue carrying out the program so that she can continue a parent-child relationship with her son:

I've never not wanted to see my child. Last winter, I spent most of it staying off and on with friends or actually living on the street with nowhere to go, no car. My father - - my father had my car at one point and it took a while before I could get it back from my father, so I had to walk the streets.

When questioned about missed visitation appointments, Mother testified:

I didn't have no place to shower, no place to eat. I was - - there was nowhere for me to go. . . back in February, I was in the hospital. I mean, I didn't have nowhere to go and I kept begging my father if he would let me stay there and he wouldn't. And, of course, we got into a - - you know, an argument and he - - every time something goes wrong, they call the police to take me away to the stress unit if I oppose anyone.

Significantly, when asked "Why should his Honor believe that you'll stay on the medicines now?" Mother replied:

Because I love my son, and I'll do anything, even if it's wrong, to get my son back. I will take anything to get my son.

\* \* \*

But as far as schizophrenia, I don't feel like I have the right diagnosis. Schizophrenia is a very, very strong

diagnosis to put on somebody. Schizophrenic people are liable to do anything and I [don't] feel like I'm like that.

She testified that, in her opinion, being on the prescribed medication for schizophrenia does not account for any of her past successes in having a place to live, having a job, or being able to keep appointments for visitation with her son. She recognizes no correlation between the fact that, on each occasion when her son was returned to her custody, she was taking the medication. She feels that the only help she obtains from the medication is that she sleeps better, and she thinks sleep medication would serve her better, "but I'm not a doctor."

When questioned by the Child's Guardian Ad Litem, she testified that her son was taken away from her on each of the occasions when he was sent to foster care because people who didn't like her were acting on their grudges against her. She does not believe that she was "so neglectful that my child should be taken away and punished for the things that have happened." The Guardian Ad Litem filed a Report in which he described his interviews with Mother, the Child, and Alesia Shipman. In that Report, he advised the Court:

> Based upon the above investigation, I believe that it would be in the best interests of [A.J.P.] to have Teresa Pruitt's parental rights terminated. There has been ample time for many years for Ms. Pruitt to work a plan of care and demonstrate an ability and willingness to reunify with [A.J.P.] She has repeatedly refused to work her plan, take her medication, and make any real effort at obtaining [A.J.P.]. She has, in my two interviews, refused to acknowledge any culpability in the situation, instead always casting the blame to some third party. I see no reason for the behavior to do anything but continue.

When questioned by the trial judge, Mother testified that she voluntarily gave up her other two children for adoption "because I didn't have nowhere to stay and I was pregnant and I didn't want my children in the projects, not when they had a nice home." The trial judge then tried to explain to Mother that her third child deserved the same chance she had given her first two, and that she had plainly been unable, over seven years, to provide a stable home for him. Mother could not agree. The trial judge found:

> Ms. Pruitt, if this was the first time you had gone to the well here, I would think it was a cool, refreshing drink of water, but it's not the first time. And even today, the testimony today, you don't accept the diagnosis of schizophrenia and we've been dealing with this now for seven years.

-7-

There are different hospitalizations, different doctors, different observations both by the mental health professionals and by the Department of Human Services and the Department of Children's Services professionals. You seem to be the only one in disagreement with the diagnosis, it's someone else's fault. It's your ex-husband's fault. It's the doctors' fault because they won't give you the diagnosis you want. It's everyone's fault and you refuse to accept the diagnosis and unless an immense amount of pressure is brought to bear on you, you know, stay on the medication, you revert back, and one of the petitions alleges, "talking out of your head." I don't know what that means. I wasn't there, I didn't see that, but it - - it ends up in situations, and this is the third time where this young man has a totally unstabilized life. It's as if the ground he walks on is constantly shaken by the earthquake of your schizophrenia or of your post-traumatic stress or of your talking out of your head or of your not taking your medication or your not showing up for a visit or now showing up for another visit and he just looks out the window.

The ground he stands on is not stable; it shakes. He can't stand on it. He can't build a life on it because you're not providing the stability, the most minuscule, minimum stability that this child needs.

You're not providing it for yourself. And from what I've heard today with your disagreement with the diagnosis, I would suspect that it's just a matter of time with or without [A.J.P.] being returned to you before you'd be off your medication again. The only way I know to give some stability to [A.J.P.'s] life is to look to someone else to do something. I cannot look to you to provide for him.

What I will do, Ms. Pruitt, is . . . I will terminate your parental rights.

**Discussion**

Mother appeals and raises two issues, which we quote:

1.      Whether the evidence preponderates against the Trial Court's finding that clear and convincing evidence exists to warrant the termination of parental rights of Teresa Hargess Pruitt to Antonio Pruitt.

2.      Whether the Trial Court erred in not appointing Teresa Hargess Pruitt counsel until approximately only two months prior to the hearing in this cause.

The State of Tennessee, Department of Children's Services, states the issues as:

1.      Whether Ms. Pruitt received the full legal representation to which she is entitled under the relevant rules.

2.      Whether clear and convincing evidence supports the trial court's decision to terminate Ms. Pruitt's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A) for failing to remedy the conditions in her life that prevented Antonio's return to her and appearing unlikely to do so in the near future.

3.      Whether clear and convincing evidence supports the trial court's decision to terminate Ms. Pruitt's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for failing to substantially comply with the plan of care.

4.      Whether clear and convincing evidence shows that termination of Ms. Pruitt's parental rights was in Antonio's best interest.

Our review is *de novo* upon the record, accompanied by a presumption of the correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Rule 13(d), T.R.A.P.; *Davis v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). The Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293 (Tenn. 1997).

Mother raises the issue that the Trial Court erred because counsel was not appointed "until approximately only two months prior to the hearing in this cause." She cites Rule 39,

-9-

Tennessee Rules of Juvenile Procedure, which provides, as pertinent:

> At the beginning of the hearing, any party who appears without an attorney shall be informed of the right to an attorney, and in the case of an indigent respondent, the court shall consider the facts and circumstance es alleged and make a determination as to whether an attorney should be appointed.

Counsel for the State agrees that Rule 39 governs, and also points out Rule 13(d)(7) of the Rules of the Supreme Court, which provides, as pertinent:

> In the following cases and in all other cases required by law, the court shall advise any party who is without counsel that he or she has the right to be represented by counsel throughout the case and that counsel will be appointed to represent the party if he or she is indigent and requests the appointment of counsel.
>
>        *   *   *
>
> In cases under Title 37 of Tenn. Code Ann. in which allegations against the parents could result in finding the child dependent or neglected, or in which there is a petition for termination of parental rights.

In support of her argument, Mother complains that counsel was appointed two months before trial. "The proof at trial was that, after being appointed an attorney, Ms. Pruitt came into full compliance with the Plan of Care as set out by the Department of Children's Services." Mother argues that it was error for the Trial Court to deny her motion for a continuance at the time of trial so that Mother could accrue more than two months' time in compliance with the Plan of Care, in order to refute the State's complaint and evidence that Mother would not permanently provide a stable home for the Child. The State argues that the Trial Court's appointment of counsel for Mother two months prior to trial was sufficient to provide Mother with the full legal representation to which she is entitled under the relevant rules. The State maintains that the phrase "throughout the case" in Supreme Court Rule 13(d)(7) can only mean "after the case is initiated, i.e., . . . after the petition to terminate parental rights is filed." We agree. Although Mother and Child have had an open case with DCS for nearly seven years, the Rule requiring appointment of counsel does not come into play until a Petition to Terminate Parental Rights is filed (" . . . counsel will be appointed . . . [in cases] in which there is a petition for termination of parental rights." Rule 13(d)(7).) Giving that Rule its intended effect requires that counsel be appointed long enough before trial for adequate trial preparation. The purpose of appointing counsel is to insure that Mother is adequately represented in judicial proceedings. Mother does not argue that she was not adequately represented at trial.

-10-

Rather, her complaint is:

> had she realized the nature of the proceedings and the
> ramifications for not following the Plan of Care, she
> would have become compliant with the Plan of Care
> as set out by the Department of Children's Services,
> despite her beliefs as to the misdiagnoses of her
> condition, as the record reflects she did once being
> afforded counsel.

Basically, counsel for Mother argues that she was able, for a period of two months, to impress on Mother the necessity of following her Plan of Care, whereas all of Mother's case workers have been unable to do so. We find no statutory, regulatory or common law basis to support Mother's argument that a continuance in this case was required so that Mother would have more time to demonstrate to the Court her willingness to follow the advice of counsel. Such a showing would add nothing that would help the Juvenile Court determine the best interests of this Child. The root problem in this case is Mother's unwillingness to work with DCS by taking her medication and showing up to visit her Child. Mother has had *seven years* to demonstrate that she is willing and able to do this. We find the Trial Court did not abuse its discretion in refusing to continue the case on its docket upon Mother's motion. *See Mires v. Clay,* 3 S.W.3d 463 (Tenn. Ct. App. 1999).

We now address the primary issue in this case, which we restate as whether the State of Tennessee, Department of Children's Services, has proven by clear and convincing evidence that the Termination of Parental Rights statute, T.C.A. § 36-1-113, and the best interests of this Child require the termination of Mother's parental rights. Termination of parental or guardianship rights must be based upon: (1) a finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) that termination of the parent's or guardian's rights is in the best interests of the child. T.C.A. § 36-1-113(c). Moreover, before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated. *In Re Swanson,* 2 S.W.3d 180, 188 (Tenn. 1999); *In the Matter of M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998); *Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn. 1995).

This Court discussed the "clear and convincing evidence" standard in *O'Daniel v. Messier,* 905 S.W.2d 182 (Tenn. Ct. App. 1995):

> The "clear and convincing evidence" standard defies
> precise definition. *Majors v. Smith,* 776 S.W.2d 538,
> 540 (Tenn. Ct. App. 1989). While it is more exacting
> than the preponderance of the evidence standard,
> *Santosky v. Kramer,* 455 U.S. at 766, 102 S.Ct. at
> 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.,*
> 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does
> not require such certainty as the beyond a reasonable

> doubt standard. *Brandon v. Wright,* 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves,* 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *Brandon v. Wright,* 838 S.W.2d at 536; *Wiltcher v. Bradley,* 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier,* 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

\* \* \*

-12-

T.C.A. § 36-1-113(g). That statute also describes the standard for determining whether termination is in the best interest of the Child in such cases:

    (i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

        (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

        (2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies fur such duration of time that lasting adjustment does not reasonably appear possible;

        (3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

        (4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

        (5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

        (6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward other children in the family or household;

        (7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

        (8)    Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

        (9)    Whether the parent or guardian has paid child support

> consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i). The statute also requires the trial court to enter an Order which makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing. T.C.A. § 36-1-113(k).

As stated, the Trial Court terminated Mother's parental rights by its October 8, 1999, Final Decree of Guardianship. The Trial Court specifically found that the State of Tennessee, Department of Children's Services, had proved by clear and convincing evidence that Mother had abandoned the Child pursuant to T.C.A. § 36-1-113(g)(3)(A) *et. seq.,* in that the Child has been removed from the custody of the Mother for more than six months. The Trial Court also found that the conditions which led to the removal of the Child from the Mother still persisted and would, in all reasonable probability, cause the Child to be further abused or neglected; that there is little likelihood that the conditions will be remedied in the near future; that the Child is of such an age that the continuation of the legal parent and child relationship greatly diminishes the Child's chances of early integration into a stable and permanent home; and further, that pursuant to T.C.A. § 36-1-113(g)(2), Mother has failed to comply with the Statement of Responsibilities as provided in the Plan of Care. Further, the Court found that, despite continuing services, caseworkers and the Court cautioning her to make changes, and previous occasions of foster care for the Child, Mother has failed to make significant or lasting changes to make placement of the Child with Mother possible in the foreseeable future.

We have carefully reviewed the evidence in this case and find it to be beyond clear and convincing in support of the Trial Court's findings of fact to justify termination of Mother's parental rights. Mother's mere statements of desire and intent to permanently provide a stable home for this Child ring hollow in the face of the evidence of her lifestyle during most of this Child's life. Counsel for Mother argues:

> Each time, the reason for [A.J.P.'s] admittance into foster care was directly related to Ms. Pruitt's mental illness and her related failure to take the prescribed medication. At no time was [A.J.P.] placed in foster care because of an intentional or abusive act on behalf of Ms. Pruitt.

We cannot agree. Mother's numerous decisions to refuse to take her medication were intentional acts. Her attorney, in providing able representation to Mother, proved that Mother is able to decide to take the medication by convincing Mother to take the medication for the two months immediately prior to trial. When Mother made the deliberate choice not to take the medication, and not to come for visits, during her Child's three stays in foster care, she was choosing her personal freedom and desires over her Child's welfare. We are bound, as was the Trial Court, to seek the best interests of this Child. The factors weighing on what is in the best interest of the Child are statutorily described in T.C.A. § 39-1-113(i). The evidence in this case is clear and convincing that this situation meets

-14-

at least eight of those nine statutory factors. Accordingly, we find the Trial Court correctly determined that the best interests of this Child require the termination of Mother's parental rights because substantial harm to the Child will result if those parental rights are not terminated.

## **CONCLUSION**

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, Teresa Pruitt.